UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRETT RAYMOND MILLER,<br><br>Plaintiff,<br><br>v.<br><br>CORONADO BEACH WISE RIDERS, INC., d/b/a "CORONADO BEACH HARLEY DAVIDSON," AMERICAN CREDIT ACCEPTANCE, LLC, and DOES 1 through 10, et al.,<br><br>Defendant. | Case No.: 3:25-cv-2130-RSH-VET<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>[ECF No. 4] |

    Pending before the Court is a motion to compel arbitration by defendant American Credit Acceptance, LLC ("ACA"). ECF No. 4. Plaintiff Brett Raymond Miller opposes. ECF No. 10. Co-defendant Coronado Beach Wise Riders, Inc. ("CBWR") states that it does not oppose the motion to compel. ECF No. 11. As set forth below, the Court grants the motion.

//

//

## I. BACKGROUND

### A. Plaintiff's Allegations

Plaintiff filed this action in California Superior Court for the County of San Diego on June 5, 2025, naming CBWR and ACA as defendants. ECF No. 1-2 ("Compl.").

The Complaint alleges as follows. CBWR is a motorcycle dealer located in National City, California. Compl. ¶ 13. Beginning in early May, 2024, Plaintiff began communicating with CBWR about purchasing a motorcycle from CBWR. *Id.* ¶¶ 19-23. On or about June 8, 2024, Plaintiff went to the CBWR dealership and saw the vehicle he ultimately purchased, a used 2017 Harley-Davidson motorcycle (the "Vehicle"). *Id.* ¶ 28. The Vehicle had a sticker price of $5,991.00. *Id.* ¶ 28. Plaintiff was told by representatives of CBWR that he would need to make a down payment of $2,000 to purchase the Vehicle. *Id.* ¶ 32.

On June 12, 2024, Plaintiff made the down payment of $2,000 in two payments. *Id.* ¶ 34. That afternoon, he returned to the dealership to sign the purchase contract. *Id.* ¶ 37. A representative of CBWR named "Art" presented Plaintiff with a stack of documents, including a Retail Installment Sales Contract ("RISC"). Plaintiff did not have the opportunity to read the document in full, and Art told Plaintiff "not to worry, because he would get a copy of all of the documents." *Id.* ¶¶ 42-44. While Plaintiff was in the process of signing the RISC and other documents, Art told Plaintiff that depending on the price of an "extended service warranty," the price could increase. *Id.* ¶ 45. Art took the signed documents, but did not provide Plaintiff a copy that day. Another CBWR representative, "Jon," told Plaintiff that he could not give Plaintiff possession of the Vehicle that day because the Vehicle still needed to pass a "100 point inspection." *Id.* ¶ 51.

During the days that followed, CBWR did not deliver the Vehicle, and Plaintiff noticed that the Vehicle remained on CBWR's website as inventory. *Id.* ¶¶ 52-53. When Plaintiff expressed concern, Jon sent Plaintiff a text message stating, "do not worry we are waiting on the bank. it does take a bit for them to get it an return." *Id.* ¶ 54.

|   |   |
|---|---|
| 1 | On or about June 21, 2024, Plaintiff received a voice message and a text message from a representative of ACA, providing a link to ACA's website. *Id.* ¶ 55. Plaintiff clicked on the link, saw instructions on the website to call ACA, called ACA, and spoke to a representative. *Id.* ¶¶ 55-57. Plaintiff told the representative that he had never received a copy of the RISC, or possession of the Vehicle. *Id.* ¶ 58. |

A few hours later, Jon called Plaintiff and told him he could pick up the Vehicle the next morning. *Id.* ¶ 60. Jon did not respond to Plaintiff's request for a copy of the documents he signed. *Id.* ¶ 61.

On or about June 26, 2024, Plaintiff received possession of the vehicle. *Id.* ¶ 63.

On January 21, 2025, after months of waiting, Plaintiff went to CBWR's dealership with a letter demanding a copy of the documents he signed. *Id.* ¶ 65. No one would accept the letter or provide the documents, so Plaintiff eventually left the letter in CBWR's mailbox and left. *Id.* ¶ 66.

On January 24, 2025, Plaintiff returned to the dealership and was finally provided with a copy of the documents he signed. *Id.* ¶ 67. The copy that Plaintiff received had Plaintiff's signatures in different colors of ink, despite the fact that Plaintiff had used the same pen in signing the documents. *Id.* ¶ 68. Some documents also bore an electronic signature that Plaintiff never provided. *Id.* ¶ 69. The RISC, under the header "Truth-in-Lending Disclosure," now contained boxes that had not previously been filled in at the time that Plaintiff signed the document. *Id.* ¶ 70.

On the RISC, the "cash price" for the Vehicle now read "$6,991.00," while on other documents that Plaintiff signed on June 12, 2024, the price was $5,991. *Id.* ¶ 71. The RISC also contained a separate charge of $4,086 for an "extended warranty." *Id.* ¶ 72. The total price was therefore $12,107.65, over double the price of $5,991 that had been originally advertised. *Id.* ¶ 73.

On or about January 30, 2025, ACA repossessed the Vehicle and subsequently sold it. *Id.* ¶ 74. In a letter dated April 16, 2025, ACA advised Plaintiff that the gross proceeds

from the sale of the Vehicle were $2,600, and demanded that Plaintiff pay ACA the sum of $10,070.30. *Id.* ¶ 77.

The Complaint brings the following claims against both Defendants: (1) violation of the Truth-in-Lending Act and Regulation Z; (2) violation of the Rees-Levering Act; and (3) common law fraud. Each of these three claims is brought against ACA as "assignee of CBWR's rights under the RISC at issue here." *Id.* ¶¶ 84, 89, 96. The Complaint also brings a fourth claim against ACA only for violation of the Rosenthal Act.

### B.  Procedural History

On August 18, 2025, defendant ACA removed the case to this Court. ECF No. 1. ACA's notice of removal stated that co-defendant CBWR consented to the removal.

On August 25, 2025, ACA filed its motion to compel arbitration. ECF No. 4. The notice of motion seeks to compel arbitration of Plaintiff's claims "against the defendants," but the supporting brief refers instead to compelling arbitration of Plaintiff's claims "against ACA." ECF Nos. 4, 4-1. Plaintiff did not timely oppose the motion.

On August 26, 2025, CBWR filed an Answer to the Complaint. ECF No. 6. CBWR did not either join or oppose ACA's motion to compel arbitration.

On September 6, 2025, this Court entered an order inviting supplemental briefing. ECF No. 7. The Court noted the ambiguity about the scope of the claims for which ACA was seeking to compel arbitration, and also noted the absence of any opposition or joinder. *Id.* Thereafter, ACA clarified that it is seeking to compel arbitration of all claims in this action, including those against CBWR. ECF No. 9. Plaintiff has opposed the motion to compel. ECF No. 10. CBWR has filed a statement of non-opposition. ECF No. 11.

### C.  The Arbitration Provision in the RISC

ACA's motion to compel is based on an arbitration provision (the "Arbitration Provision") contained in the RISC. ECF No. 4-3 at 8-9.[1] The Arbitration Provision states

---

[1]  Citations herein the RISC are to the electronically generated page numbers on the top right of the page.

that "You or we (including any assignee) may elect to resolve any Claim by neutral, binding arbitration and not by a court action."[2] *Id.* at 8. The term "Claim" is defined to include "any claim, controversy, or dispute between you and us or our employees, agents, successors, assigns or affiliates arising from or relating to" the purchase of the Vehicle, the RISC, or "any related transaction, occurrence, or relationship." *Id.* The Arbitration Provision further states, "If either party elects to resolve a Claim through arbitration, you and we agree that no trial by jury or other judicial proceeding will take place." *Id.* Furthermore, "[t]o the extent allowed by law, the validity, scope and interpretation of this Arbitration Provision are to be decided by neutral, binding Arbitration." *Id.* The Arbitration Provision also sets forth a process for rejection of that provision within 30 days. *Id.*

The two pages containing the Arbitration Provision appear to be initialed by Plaintiff.[3] Plaintiff's initials also appear below a separate section toward the end of the RISC that states:

> **Arbitration Provision and Process to Remove**
>
> **This Contract contains an Arbitration Provision that <u>affects your rights</u>.** By signing this Contract, you agree that either of us may request and require the other to resolve disputes or claims through arbitration instead of a lawsuit. The Arbitration Provision includes a process you can follow in the next 30 days if you reconsider and want to reject the Arbitration Provision. **By initialing this section, you confirm that you read, understand, and agree to the Arbitration Provision in this Contract, including the process to reject it.**

*Id.* at 9 (emphasis in original).

---

[2] The RISC identifies the seller as CBWR, and the buyer as Brett Raymond Miller. ECF No. 4-3 at ECF p. 2.
[3] Although the Complaint alleges that the final versions of the documents he signed on June 12, 2024 contain signatures by Plaintiff that (suspiciously) appear to be in different ink colors, neither the Complaint nor Plaintiff's brief contests the authenticity of his signatures or initials contained in the version of the RISC offered as an exhibit by ACA in its motion to compel.

      The RISC appears to be signed by both Plaintiff and a representative of CBWR, on the last page, bearing the typewritten date of June 12, 2024. *Id.* at 10. Below those signatures, at the very end of the agreement, the RISC states: "**Assignment.** This Contract and Security Agreement is assigned to American Credit Acceptance, PO Box 4419, Wilmington, OH 45177-4419, the Assignee, phone 866-202-6916." *Id.* That portion also appears to be signed by a representative of CBWR, and is likewise dated June 12, 2024. *Id.*

## II.    LEGAL STANDARD

      The Federal Arbitration Act ("FAA") governs arbitration agreements. 9 U.S.C. § 2. The FAA "was enacted . . . in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). It "reflect[s] both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract[.]'" *Id.* (citations omitted) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA "requires courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) (quoting *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013)).

      Under the FAA, a party may seek a court order compelling arbitration where another party refuses to arbitrate. 9 U.S.C. § 4. A federal court "must compel arbitration if (1) a valid agreement to arbitrate exists and (2) the dispute falls within the scope of that agreement." *Geier v. m-Qube Inc.*, 824 F.3d 797, 799 (9th Cir. 2016). The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *See Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d

1320, 1323 (9th Cir. 2015) (citing *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)). "[T]he party resisting arbitration bears the burden[] of proving that the claims at issue are unsuitable for arbitration." *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018) (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (citing *Moses H. Cone*, 460 U.S. at 24–25). The court, "upon being satisfied that the issue involved . . . is referable to arbitration, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3.

### III.  ANALYSIS

Plaintiff's opposition brief does not challenge the validity or enforceability of the Arbitration Provision, and indeed states that Plaintiff is willing to arbitrate his claims against ACA. ECF No. 10 at 5. Plaintiff does not appear to dispute that his causes of action fall within the types of arbitrable disputes described in the Arbitration Provision. Plaintiff objects, however, to being compelled to arbitrate his claims against *CBWR*. He writes:

> Plaintiff's opposition is based primarily on a single issue of law: Defendant Coronado Beach Wise Riders, Inc., a suspended California corporation, lacks standing to compel arbitration, and co-Defendant American Credit Acceptance, LLC cannot assert rights for [CBWR] when [CBWR] themselves have forfeited the right to assert those same claims, by failing to maintain their corporate status.

*Id.* at 2. Plaintiff submits records from the California Secretary of State, reflecting that on February 3, 2025, CBWR's corporate status was suspended. *Id.* at 2; ECF No. 10-2.[4] Plaintiff quotes the California Supreme Court's opinion in *Reed v. Norman*, 48 Cal. 2d 338, 343 (1957), which stated that a corporation "may not prosecute or defend an action, nor

---

[4]  At Plaintiff's request, and absent objection by Defendants, the Court takes judicial notice of these records.

appeal from an adverse judgment in an action while its corporate rights are suspended for failure to pay taxes."

Pursuant to the language of the RISC, CBWR assigned its rights under that agreement—including under the Arbitration Provision—to ACA. The assignment occurred on June 12, 2024, and preceded CBWR's suspension on February 3, 2025. ACA's rights as assignee are not divested by CBWR's subsequent corporate suspension. CBWR, for its part, does not seek to enforce its own rights pursuant to the Arbitration Provision; instead, it simply states that it does not oppose the motion to compel and is willing to participate in arbitration. ECF No. 11 at 1.

To determine whether ACA is able to compel arbitration of Plaintiff's claims against CBWR, the Court reverts to the terms of the Arbitration Provision. As discussed above, the term "Claim" includes "any claim, controversy, or dispute between you and us or our employees, agents, successors, assigns or affiliates arising from or relating to" the purchase of the Vehicle, the RISC, or "any related transaction, occurrence, or relationship." ECF No. 4-3 at 8. The plain language contemplates arbitration of controversies between the buyer and CBWH, as well as controversies between the buyer and an assignee of CBWR. The Arbitration Provision further states, "You or we (including any assignee) may elect to resolve any Claim by neutral, binding arbitration and not by a court action." *Id.* The plain language reflects that either Plaintiff, or CBWR, or CBWR's assignee may invoke the Arbitration Provision to resolve any Claim. This is what ACA, as CBWR's assignee, has done here. The Court concludes that under the language of the Arbitration Provision, ACA is entitled to compel arbitration of Plaintiff's claims in this case as to both Defendants.[5]

//
//

---

[5] Plaintiff argues that CBWR, as a suspended corporation, is not entitled to participate in its defense of this lawsuit. This order is made without prejudice to Plaintiff raising that argument before the arbitrator.

## IV. CONCLUSION

For the foregoing reasons, the Court:

1. **GRANTS** ACA's motion to compel arbitration [ECF No. 4].

2. **ORDERS** the Parties to submit to arbitration in the manner provided for in the Arbitration Provision contained in the Retail Installment Sales Contract.

3. **STAYS** this action pending resolution of the arbitration.

4. **ORDERS** the Parties to file a joint report, no longer than five (5) pages, regarding the status of this action within twenty-one (21) days of the completion of the arbitration, or within six (6) months from the date of this Order, whichever occurs first.

**IT IS SO ORDERED**.

Dated: October 10, 2025

_____
Hon. Robert S. Huie
United States District Judge